# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

ENCAP LLC,

               Plaintiff,

      v.                                       Case No. 11-C-808

OLDCASTLE RETAIL INC. and OLDCASTLE
LAWN & GARDEN, INC.,

               Defendants.

---

## DECISION ON CLAIM CONSTRUCTION

---

This patent infringement action is before the Court for claim construction following briefing and a *Markman* hearing. In the underlying action, Plaintiff accuses the Defendants' "Green 'n Grow" lime product and its "Jolly Gardener Fast Acting Lime" of infringing two of its patents: U.S. Patent Nos. 7,503,143 (the '143 Patent) and 7,874,101 (the '101 Patent). A preliminary injunction has already been issued; as of May 18, 2012, Oldcastle has been enjoined from manufacturing, distributing or selling its Green 'n Grow and Jolly Gardener fast acting lime products. (ECF No. 61.) What follows is this Court's construction of the 23 claims at issue.

## I. LEGAL STANDARD GOVERNING CLAIM CONSTRUCTION

A patent includes both a written description of the invention and claims. The written description, which usually includes figures, is often referred to as the "specification" of the patent. The specification ends with one or more numbered sentences that are the patent's "claims." These claims describe the invention and set forth the metes and bounds of the patent.

Claim construction is an issue of law for the Court. If a material issue in the case, such as infringement or validity, involves a dispute about the meaning of certain claim language, the Court needs to construe that disputed claim language. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The only claim language that needs to be construed is the language "in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Claim construction begins with and focuses on the words of the claim. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619–20 (Fed. Cir. 1995). How a person of ordinary skill in the art understands those claim terms provides an objective baseline for claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). In attempting to determine the meaning of disputed claim language, the Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* at 1314. "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (internal quotation marks omitted). Extrinsic evidence includes sources such as the testimony of experts and knowledgeable technical witnesses, dictionaries, and learned treatises. *Id.* at 1317–18. Extrinsic evidence is "less significant" and "less reliable" than the intrinsic record in determining the meaning of the claim language. *Id.* Thus, to the extent that the Court considers extrinsic evidence, it does so in the context of the intrinsic evidence and is cognizant of "the flaws inherent" in such evidence. *Id.* at 1319.

2

"The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims" and is not limited "to his preferred embodiment" and the court will not "import a limitation from the specification into the claims." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning "against confining the claims to [preferred] embodiments[.]"). Even where "a patent describes only a single embodiment, the claims should not be construed as limited to that embodiment" absent a clear disavowal of claim scope. *Phillips*, 415 F.3d at 1323; *see Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1057–58 (Fed. Cir. 2009) (explaining that it is improper to limit a claim to embodiments described in the specification where "there is no clear intention to limit the claim scope").

The Court may also consider the patent's prosecution history, including reexamination proceedings. *Phillips*, 415 F.3d at 1317. The prosecution history, which is part of the "intrinsic evidence," consists of the "complete record of the proceedings before the USPTO and includes the prior art cited during the examination of the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution history includes any arguments or amendments made by the applicant in securing patent rights and these arguments and amendments may be considered during the claim construction process. *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The correct claim construction must be consistent with the arguments the applicant made to overcome a prior art rejection. *See id.*

3

## II. CLAIM CONSTRUCTION AND ANALYSIS

### A. The '143 Patent

The '143 Patent describes "a method for applying PAM to soil wherein said PAM is intermixed, impregnated, and/or applied to solid carriers." ('143 Patent Abstract.) The parties have disputes over ten terms in the '143 Patent, as will be discussed below.

### 1. Applying

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| applying . . . (solid carrier to soil) or applying water to said solid carrier | putting on, upon, and/or to another | laying or spreading on, including intermixing, adding, or bulk blending | putting on, upon, and/or to another |
| applying water soluble PAM to a solid carrier | putting on, upon, and/or to another to unite or join as one | laying or spreading on, including intermixing, adding, or bulk blending | putting on, upon, and/or to another to unite or join as one |

Oldcastle implies that the term "applying" requires a great deal of construction, going so far as to include examples of prior art techniques of incorporating PAM into a solid carrier, such as intermixing, adding, or bulk blending. But nothing in the claims or the rest of the intrinsic evidence suggests that the term "applying" connotes anything other than its ordinary meaning, which is "putting on, upon, and/or to another." *Cf. Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281 1290–91 (Fed. Cir. 2000). Furthermore, nothing in the patent ever describes application of a bulk blend; in fact, the term "bulk blend" or its equivalents is never even used in the patent. Mr. Green even admitted in his deposition that a bulk blend is two separate particles. (Green Dep. at 129.) Thus, in a bulk blend, since there is no PAM in the lime (i.e. the solid carrier) the PAM

4

cannot leach out of the lime. (*Id.* at 130.) As a general matter, therefore, I agree with Encap "applying" in the patent means its more common, ordinary usage of "putting on, upon, and/or to another."

The parties further disagree about whether the term's meaning changes depending on the substance being applied. Encap suggests "applying" takes on a slightly different, narrower meaning when the substance being applied is water-soluble PAM. Encap contends that when PAM is the substance being applied, "applying" takes on an additional meaning — that the application has the end goal or result of uniting or joining the substances together as one. Encap defends this distinction by noting that since the claim requires that the PAM must leach out of the solid carrier, in order for it to leach out of the solid carrier, it must first be *in* the solid carrier. Therefore, Encap contends, applying PAM must include the additional limitation of uniting or joining as one. (ECF No. 64 at 9.) I find this argument convincing. While it may be somewhat strange to use the same term — applying — for two slightly different meanings, the contexts (and more importantly, underlying substances) operate differently and I am therefore convinced Encap's proposed constructions are correct. They will accordingly be adopted.

## 2. Leaching

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| leaching said PAM out of said solid carrier with water into soil | releasing, freeing, and/or delivering the PAM from the solid carrier with water to the soil | causing PAM to enter into soil directly by percolation as a result of applying water to the solid carrier to dissolve and separate PAM from the solid carrier | releasing, freeing, and/or delivering the PAM from the solid carrier with water to the soil |

5

| leaching said PAM out of said solid carrier into said soil | releasing, freeing, and/or delivering PAM out of the solid carrier to the soil | causing PAM to enter into soil directly by percolation as a result of applying water to the solid carrier to dissolve and separate PAM from the solid carrier | releasing, freeing, and/or delivering PAM out of the solid carrier to the soil |
| --- | --- | --- | --- |

In a general sense, as this Court has already discussed in the preliminary injunction order, "leaching" means that once water is applied after the solid carrier is applied to the soil, PAM is released into the soil. ('143 Patent, Col. 8, ll. 3–8; ECF No. 61 at 7–8.) No further construction of "leaching" is warranted as the meaning of the term is clear from the intrinsic evidence. As the claims and the specification indicate, the term "leaching" means releasing, freeing, and/or delivering PAM out of the solid carrier to the soil. The specification did not provide further or special definition of the term, demonstrating that the patentees intended the ordinary meaning to apply. *W.E. Hall Co. Inc. v. Atlanta Corrugating, L.L.C.*, 370 F.3d 1343, 1350 (Fed. Cir, 2004) ("Here, the inventor was not his own lexicographer within the four corners of the intrinsic evidence. We therefore rely on the plain and ordinary meaning of the terms.") (citations omitted).

On the other hand, Oldcastle's constructions attempt to import additional limitations to the term, nowhere found in the claims, specification or evidence. In fact, the claim as proposed by Oldcastle suggests it would require PAM to enter into the soil directly by percolation. This is nowhere in the patent and even inconsistent with Oldcastle's own expert, Mr. Green. Mr. Green observed a jar with Green 'n Grow product and water. He stated some of the PAM leached out or was released from the lime. (Green Dep. at 132.) He further stated that in order to "leach" PAM needs to be within the carrier or component. (*Id.*) He also stated that in order to leach out, PAM would have to be bound to the solid carrier. (*Id.* at 133.) This process is much more in line with

6

Encap's proposed construction than the percolation process suggested by Oldcastle's definition. The term "leaching" in the terms above will thus be construed as "releasing, freeing, and/or delivering."

**3. Binding**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------------------------------|-----------------------------------|----------------------|
| binding said PAM to said soil | PAM attaches and/or adheres to soil particles | binding PAM directly to soil after the dissolved PAM has percolated into the soil | PAM attaches and/or adheres to soil particles |

The third term at issue concerns the term "binding." On this point Encap has the better argument. The specification describes the term "binding" to be defined specifically as PAM attaches and/or adheres to soil particles. ('143 Patent, Col. 3, ll. 32–33.) Oldcastle's definition inappropriately adds that the term "binding" means that PAM binds "directly" to the soil after the dissolved PAM has "percolated" into the soil. This language is not found in the specification and does not comport with the plain and ordinary understanding that one of ordinary skill in the art would have regarding this claim language. "Binding" simply means that PAM attaches and/or adheres to soil particles.

**4. Application Rates**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------------------------------|-----------------------------------|----------------------|
| application rates | the amount or quantity applied | weight of solid carrier put on a defined area of soil | the amount or quantity applied |

7

Oldcastle disputes the meaning of "application rates" as it appears in the claims. Oldcastle's construction defines the application weight as the weight in a defined area. But this adds limitations that are not found in the patent claim or specification. This term needs very little construction; as in common usage, "application rates" simply means the rate at which the amount or quantity is applied.

**5. Desired Amount**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------|------|------|
| desired amount | a pre-determined quantity | invalid under § 112 as indefinite and not subject to construction | an intended or pre-determined quantity |

Oldcastle contends the term "desired amount" is invalid under 35 U.S.C. § 112 as indefinite. Indefiniteness arguments are disfavored at the claim construction stage. *See Nazomi Commc'ns, Inc. v. Arm Holdings, P.L.C.*, 403 F.3d 1364, 1368–69 (Fed. Cir. 2005) (warning that courts must be wary of "put[ting] the validity cart before the claim construction horse" because validity turns on factual questions that are difficult to parse at the claim construction stage); *see also Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction."). A party asserting indefiniteness at claim construction faces a heavy burden to show that a "person of ordinary skill in the art could not determine the bounds of the claims, *i.e.*, the claims were insolubly ambiguous." *Halliburton Energy Servs., Inc. v. M-I, L.L.C.*, 514 F.3d 1244, 1249 (Fed. Cir. 2008); *see also Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) ("[B]y finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity.") (internal quotation marks omitted).

8

Here, I do not believe there is ambiguity in the claim language. The term "desired amount" is clear from the claims and specification. The claim language must be read in context of the entire claim, which states: "wherein application rates of said solid carrier to said soil is related to desired amount of said PAM to be metered to said soil." ('143 Patent, Claim 1.) A person of ordinary skill in the art would understand that the purpose of the invention is to make possible the application of PAM to the soil in the amount desired, no matter what amount that might be. In other words, the claim teaches a method of applying PAM to the soil in an intended or pre-determined amount. Mr. Green even admitted in his deposition that the end user does not determine how much PAM is incorporated within the Green 'n Grow product but rather the manufacturer who chooses the 1.5% PAM. (Green Dep. at 122.) Accordingly, there is nothing indefinite in the term "desired." "Desired amount" instead simply means an intended or pre-determined quantity.

**6. Metered to Said Soil**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------------------------------|-----------------------------------|---------------------|
| metered to said soil | placed on or supplied to the soil | invalid under § 112 as indefinite and not subject to construction | placed on or supplied to the soil at a measured rate |

Oldcastle also argues that the meaning of "metered to said soil" is invalid under 35 U.S.C. § 112 as indefinite and therefore not subject to construction. Oldcastle is incorrect. As noted above, indefiniteness arguments are disfavored at the claim construction stage. *Nazomi Commc'ns*, 403 F.3d at 1368–69, *Halliburton Energy*, 514 F.3d at 1249; *see also Star Scientific*, 537 F.3d at 1371. Metering is defined as suggested by Encap in the specification of the '143 Patent. (Col. 1, ll. 17–21.) Mr. Green further stated that metered means "to be placed on or to be placed on at a certain

9

rate." (Green Dep. at 123.) The aforementioned use of the term "application rate" suggests a second rate limitation, as does the word "metering" itself, which relates to metrics and the metric system. The term "metering" is thus plainly amenable to construction. I agree with Encap that metering to said soil generally means placed on or supplied to the soil, with the one further qualification that the placement or supplementation must be done at some sort of measured rate.

**7. Soil Amendments/Amendment**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| soil amendments/ amendment | materials having beneficiary properties for the soil | any material that is worked into the soil and applied on the surface to enhance plant growth | materials having beneficial properties for the soil |

Oldcastle contends that "soil amendment" should be construed as "any material that is worked into the soil or applied on the surface to enhance plant growth." This definition attempts to add improper limitations and is inconsistent with the guidelines of claim construction. "First, we look to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention."). *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Soil amendments have many properties; they are not simply limited to enhancing plant growth and nothing in the patent suggests such limitations are appropriate. The patent itself even lists beneficial properties of soil amendments that are not limited to enhancing plant growth. ('143 Patent, Col. 1, ll. 14–17 and Col. 8, ll. 60–64.) "Soil amendments" are thus understood to be "materials having beneficial properties for the soil" without additional limitations of what these benefits may entail.

10

### 8. Adding

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| adding | applied to so as to unite or join as one and/or incorporated in any physical state | joining or uniting, including by intermixing, bulk blending, or applying | incorporated in any physical state |

Oldcastle contends that "adding" should be construed as "joining or uniting, including by intermixing, bulk blending, or applying."  Mr. Green relied solely on the dictionary definition (provided by Oldcastle's attorneys) of "add" as "to join or unite, to bring about an increase or to unite" in his declaration.  (Green Dep. at 113.)  Oldcastle and Mr. Green then added the terms "intermixing, bulk blending, or applying" which Mr. Green stated in his report that he agreed with (but then disagreed with in his deposition).  Mr. Green stated in his deposition that a bulk blend is two separate particles.  (Green Dep. at 129.)  If there is no PAM in the lime, then PAM cannot leach out of the lime.  (*Id.* at 130.)  Oldcastle's definition thus includes terms which would not put the PAM into the solid carrier, such as bulk blending.  This is contrary to the specification and the claim language, which is the single best guide as to what the claim terms mean.  *Phillips*, 415 F.3d at 1314.  Moreover, Oldcastle's proposed claim construction improperly reads limitations into the claim.  *Northern Telecom*, 215 F.3d at 1290–91.  For example, the '143 Patent never describes applying as a bulk blend; the term bulk blend or its equivalent is never used in the patent.  Bulk blending merely comes from the prior art; it is not properly incorporated into the '143 Patent.

I instead adopt the common and ordinary meaning of the term "adding", which is simply to incorporate in any physical state.  Nothing in the patent suggests this broad word should be so

11

narrowly defined as Oldcastle indicates. PAM must leach out of the solid carrier, and in order for it to leach out, it must first be in the solid carrier, or be incorporated.

**9. Agglomeration Process**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| agglomeration process | process for particle size enlargement | a method for particle size enlargement that must include agitation, pressure, liquid, and thermal processes | process for particle size enlargement |

Both sides agree that an agglomeration process is a process for particle size enlargement, and that is the definition found in the '143 Patent. (Col. 7, ll. 57–60.) However, Oldcastle adds a further restriction: that the process *must* include "agitation, pressure, liquid, and thermal processes." This construction is again misleading because it adds limitations beyond what the intrinsic evidence requires. Nothing in the patent suggests the agglomeration process includes *all* of the processes; instead the listed types are illustrative. Oldcastle makes much of the word "and" instead of "and/or" but in the context of the patent it is clear these are types or families of agglomeration processes, not required steps in a singular agglomeration process.

The patent prosecution history further bolsters this reading. A restriction requirement was ordered by the Patent Office with regards to this claim, wherein the Examiner required Encap to choose which agglomeration process Encap wanted to prosecute at the time. ('143 Patent File History, Preliminary Injunction Hearing Exhibit 1012.) Encap chose "agitation" in response to a Restriction Requirement dated September 13, 2004. (*Id.*) When the patent was granted, all the other processes were added back to the claims. In other words, if the Examiner believed the

12

agglomeration process required agitation, pressure, liquid and thermal processes as one *single* process, he could not have separated them out with the restriction requirement. I accordingly find Oldcastle's proposed definition is contrary to the intrinsic evidence. "Agglomeration process" simply means a process for particle size enlargement; additional restrictions are not consistent with the evidence.

**10. Impregnating**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| impregnating | incorporated in any physical state | placing within | placing within |

Encap suggests "impregnating" means "incorporated in any physical state", which is the same definition it suggested earlier for the disputed term "adding." Adding, however, is not nearly as precise as the process of impregnation, which conjures images of carrying and containment. This distinction is also consistent with the terms of the patent itself — in other words, the fact that the term "impregnating" was used here, whereas "adding" was used earlier, suggests the process is slightly distinct. I therefore find Oldcastle's narrower definition — "placing within" — to be more consistent with the language of the patent. *Vitronics*, 90 F.3d at 1582 ("First, we look to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention."). Accordingly, the phrase "impregnating" is held to mean "placing within."

**B. The '101 Patent**

The '101 Patent is broader than the '143 Patent. It concerns "a method for applying a water soluble soil stabilizer to soil wherein the soil stabilizer is added to a solid carrier." ('101 Patent Abstract.) The parties have disputes over several terms of the '101 Patent, some of which overlap

13

with the terms from the '143 Patent and some of which are distinct. The terms will be discussed in more detail below.

**1. Adding**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|---------------------|
| adding | applied to so as to unite or join as one and/or incorporated in any physical state | joining or uniting, including by intermixing, bulk blending, or applying | incorporated in any physical state |

The parties do not suggest there is any reason to treat the term "adding" any differently in the '101 Patent than how it was construed in the '143 Patent. For the same reasons as listed above, the Court will accordingly adopt the same construction: "incorporated in any physical state."

**2. Soil Stabilizer**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|---------------------|
| soil stabilizer | materials having soil stabilizing properties, which includes binding, or holding of soil particles | a soil amendment that is added to soil to directly affect the physical structure of the soil | materials having soil stabilizing properties |

Oldcastle's proposed definition once again tries to import limitations into the term. Specifically, Oldcastle tries to limit the term with restrictions such as requiring a "soil amendment" and that the effect be "directly." These limitations are not found in the claim language, nor are they supported by the intrinsic evidence.

Encap's proposed definition is somewhat broader but also attempts to read in language without any basis. While soil stabilizing properties may very well include binding or holding soil

14

particles, there is no basis for reading these terms directly into the claims. As discussed at the *Markman* hearing, whether the accused product (and perhaps even Encap's own product) contains soil stabilizing properties is a determination to be made by the experts; it is not an issue to be resolved in claim construction. I therefore construe the term "soil stabilizer" in the most basic, obvious manner, as supported by the claim language: "materials having soil stabilizing properties." An illustrative list of types of soil stabilizing properties is not necessary.

### 3. Releasing said water-soluble soil stabilizer out of said solid carrier into said soil

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|---|---|---|---|
| releasing said water-soluble soil stabilizer out of said solid carrier into said soil | delivering and/or freeing the water soluble soil stabilizer from said solid carrier and to the soil | causing the soil stabilizer to enter into soil directly by percolation as a result of applying water to the solid carrier to dissolve and separate the soil stabilizer from the solid carrier | freeing the water soluble soil stabilizer from said solid carrier and to the soil |

Oldcastle's constructions set forth additional limitations once again. "Releasing" has the ordinary meaning of freeing (in this case, the water-soluble soil stabilizer from said solid carrier to the soil). Limitations such as "enter into the soil directly," "percolation," and "dissolve and separate" do not add clarity, nor are they supported by the claim language or intrinsic evidence. Claim construction is not intended to allow for needless substitution of more complicated language for terms easily understood by a lay jury. *See, e.g.*, *Stanacard, LLC v. Rebtel Networks, AB*, 680 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (rejecting proposed construction of "telephone number" that only introduced additional terms into the claim and would result in confusion for the jury); *Am.*

15

*Patent Dev. Corp. v. Movielink, LLC*, 604 F. Supp. 2d 704, 716 (D. Del. 2009) (refusing to adopt a construction which was "merely a verbose paraphrasing of the claim language that otherwise offers little to assist one of skill in the art in understanding the claims"). I therefore find Encap's proposed definition more appropriate, with the minor adjustment that "releasing" does not require "delivering and freeing" but merely suggests "freeing." Releasing the soil stabilizer may have the effect of delivering it to the soil, but I do not find this to be required by the term language of "releasing."

**4. Binding said water-soluble soil stabilizer to said soil**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| binding said water-soluble soil stabilizer to said soil | water soluble soil stabilizer attaches and/or adheres to soil particles | binding the soil stabilizer directly to the soil after the dissolved soil stabilizer has percolated into the soil | water soluble soil stabilizer attaches and/or adheres to soil particles |

Oldcastle's proposed definition here suffers from many of the deficiencies of its earlier propositions: it imports unfounded and unnecessary limitations ("directly," "dissolved," "percolation") into the claim. "Binding" does not need complicated construction; its ordinary meaning (to attach, to adhere) is more than sufficient. Nothing in the claim language suggests a temporal element that Oldcastle tries to impute (i.e., "after the dissolved soil stabilizer"). I therefore adopt Encap's proposed construction, which is consistent with the evidence and the ordinary meaning of the word "binding". "Binding said water-soluble soil stabilizer to said soil" simply means that the water soluble soil stabilizer attaches and/or adheres to soil particles.

16

**5. Application Rates**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|---|---|---|---|
| application rates | the amount or quantity applied | weight of solid carrier put on a defined area of soil | the amount or quantity applied |

Neither Plaintiff nor Defendants suggest that the phrase "application rates" should be construed in a different manner in the '101 Patent as compared to the '143 Patent. Accordingly, I will use the same definition, "the amount or quantity applied," for the same reasons as listed above.

**6. Desired Amount**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|---|---|---|---|
| desired amount | a pre-determined quantity | invalid under § 112 as indefinite and not subject to construction | an intended or pre-determined quantity |

As in the '143 Patent, I am not convinced here that the term "desired amount" is indefinite under 35 U.S.C. § 112. For the reasons listed with respect to the '143 Patent, I think it is a definite term appropriately understood to mean "an intended or pre-determined   quantity."

**7. Metered to Said Soil**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|---|---|---|---|
| metered to said soil | placed on or supplied to the soil | invalid under § 112 as indefinite and not subject to construction | placed on or supplied to the soil at a measured rate |

I am similarly unconvinced that the term "metered to said soil" is any more indefinite in the '101 Patent than it was in the '143 Patent. The parties do not argue for a different reading of this

17

term and accordingly I will adopt the same construction of the term as used in the '143 Patent: "placed on or supplied to the soil at a measured rate."

## 8. Soil Amendments/Amendment

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| soil amendments/ amendment | materials having beneficial properties for the soil | any material that is worked into the soil or applied on the surface to enhance plant growth | materials having beneficial properties for the soil |

I likewise see no reason to diverge from my construction analysis in the '143 Patent for the term "soil amendments/amendment." For the reasons listed above, the Court will adopt the construction "materials having beneficial properties for the soil."

## 9. Holds Mineral Elements in Said Soil/Holds Nutrients in Said Soil

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| holds mineral elements in said soil/holds nutrients in said soil | improving the capacity to keep the mineral elements and nutrients in soil | maintains the mineral elements/nutrients within the soil | retains mineral elements/nutrients within the soil |

The parties disagree over the meaning of "holds" in this particular claim. Here, I think Oldcastle has the preferable approach. "Holds" merely suggests retention, whereas Encap's proposed construction suggests some sort of activism and improvement. I do not think Encap's approach, which seeks to import additional limitations into the terms, is the correct one. Oldcastle's suggestion of maintenance is much closer, but I think in context the "holding" is actually, as aforementioned, more of a retention than a maintenance. The minerals are remaining in the soil; they are not being actively upkept as "maintenance" can imply. The term will accordingly be construed as "retains mineral elements/nutrients within the soil."

18

### 10. Improving Soil Penetration

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------------------------------|-----------------------------------|----------------------|
| improving soil penetration | assisting with soil drainage | invalid under § 112 as indefinite and not subject to construction | assisting with soil drainage |

Oldcastle again seeks to have a term declared as invalid under 35 U.S.C. § 112 but as previously discussed, indefiniteness arguments are disfavored at the claim construction stage. Furthermore, I do not find the indefiniteness argument convincing; "improving soil penetration" is being used in accordance with its ordinary meaning. Oldcastle's expert, Mr. Green, readily understood that penetration can be water moving into the soil, penetrating the soil, moving or putting through the soil. (Green Dep. at 134.) Mr. Green further stated that methods to improve soil penetration are adding organic matter, not tilling the soil, and growing crops with larger group masses. (*Id.* at 135.) Mr. Green likened the word penetration to "infiltration." (*Id.*) Overall, Mr. Green suggested he understood what was meant by the term, and his understanding was consistent with the common and ordinary meaning of the claim term, as proposed by Encap: "assisting with soil drainage."

### 11. Applying

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------------------------------|-----------------------------------|----------------------|
| applying . . . (to soil) or applying water to said solid carrier | putting on, upon, and/or to another | laying or spreading on, including intermixing, adding, or bulk blending | putting on, upon, and/or to another |
| applying water soluble soil stabilizer to a solid carrier | putting on, upon, and/or to another to unite or join as one | laying or spreading on, including intermixing, adding, or bulk blending | putting on, upon, and/or to another to unite or join as one |

19

The parties do not suggest, nor does anything in the patent or intrinsic evidence require, a different interpretation, for the '101 Patent, of the multiple usages of the term "applying" from the '143 Patent. For the reasons listed above, the Court will adopt the same constructions for the term "applying" as listed in the '143 Patent. I am similarly convinced here of the need to add the additional clarification — "to unite or join as one" — in the application of a water soluble soil stabilizer to a solid carrier, for the reasons discussed in the '143 Patent above.

**12. Leaching Said Water-Soluble Soil Out of Said Solid Carrier With Water Into Said Soil**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| leaching said water-soluble soil stabilizer out of said solid carrier with water into said soil | releasing, freeing and/or delivering water-soluble soil stabilizer from the solid carrier with water into the soil | causing the soil stabilizer to enter into soil directly by percolation as a result of applying water to the solid carrier to dissolve and separate the soil stabilizer from the solid carrier | releasing, freeing, and/or delivering water-soluble soil stabilizer from the solid carrier with water into the soil |

As discussed with the '143 Patent, Encap's interpretation of "leaching" is the more convincing one. Oldcastle's proposed construction attempts to import, improperly, additional terms — "directly," "by percolation," "to dissolve and separate" — into the claim. A more straightforward construction is preferable: "releasing, freeing, or delivering water-soluble soil stabilizer from the solid carrier with water into the soil."

**13. Agglomeration Process**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|-------------------------------|-----------------------------------|----------------------|
| agglomeration process | process for particle enlargement | a method for particle size enlargement that must include agitation, pressure, liquid, and thermal processes | process for particle enlargement |

20

Case 1:11-cv-00808-WCG   Filed 06/19/12   Page 20 of 21   Document 83

The parties do not suggest and nothing in the intrinsic evidence indicates that "agglomeration process" should be construed any differently in the '101 Patent than it was in the '143 Patent. Accordingly I will adopt, for the same reasons listed above, the same construction: a "process for particle enlargement."

**14. Impregnating**

| Term | Encap's Proposed Construction | Oldcastle's Proposed Construction | Court's Construction |
|------|------------------------------|-----------------------------------|----------------------|
| impregnating | incorporated in any physical state | placing within | placing within |

I similarly do not find any reason to diverge from the construction of the term "impregnating" as discussed in the '143 Patent. The '101 Patent will therefore adopt the same construction: "placing within."

**III. CONCLUSION**

The disputed claim language is constructed as noted in the far right hand column of each above chart for the reasons set forth above.

Dated this   18th   day of June, 2012.

                                     s/ William C. Griesbach
                                    William C. Griesbach
                                    United States District Judge

21